IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| C.T, a minor, by his next friends and parents, B.T and G.T. | : : : : | CIVIL ACTION No. _____ |
| Plaintiffs, | : : | **ELECTRONICALLY FILED** |
| v. | : : | |
| HEMPFIELD AREA SCHOOL DISTRICT, | : : | **JURY TRIAL DEMANDED** |
| Defendants. | **:** : | |

## COMPLAINT

Plaintiffs C.T. and his parents, B.T. and G.T., by their attorneys, file this Complaint against Defendant Hempfield Area School District and state the following:

### Jurisdiction and Venue

1. This action arises in part under federal law and in part under Pennsylvania law.

2. Jurisdiction over Plaintiff's claims is conferred on the Court by 28 U.S.C. §§ 1331, 1343, and 1367.

3. Venue in this District is proper under 28 U.S.C. § 1391(b).

### Parties

4. Plaintiff C.T. is a minor student who lives with his parents, B.T. and G.T., within the geographical boundaries of Hempfield Area School Districts in Westmoreland County, Pennsylvania.

5. Defendant Hempfield Area School District (District) is a Pennsylvania public school district. The District's administrative offices are in Westmoreland County at 4347 Route 136, Greensburg, PA 15601.

**Factual Background**

6. C.T. is a young man with Pervasive Developmental Disorder and a speech and language impairment.

7. C.T. began his 6th grade school year at Wendover Middle School in the District in September 2015.

8. Before the 2015-2016 school year, C.T. had not been restrained in school.

9. During the 2015-2016 school year, C.T.'s behavior became increasingly more challenging.

10. C.T. was restrained in school at Wendover on several occasions.

11. Before February 1, 2016, the District called C.T.'s parents to remove him from school on 11 days due to C.T.'s behavior.

12. The behaviors that prompted C.T.'s restraints and the District's requests that his parents remove him were uncharacteristic of C.T.

13. As a result, the District counseled C.T.'s parents to transition him to a more restrictive school placement in the District.

14. The District suggested that C.T.'s parents agree to transition C.T. to Harold Middle School in the District, which the District stated could provide a more appropriate placement for C.T.

15. The District met with C.T.'s parents at Harold in late January 2016 to review the placement and the services that would be provided to C.T.

16. Based on their meeting with the District and statements and promises made by the District regarding the appropriateness of placement at Harold for C.T., B.T. and G.T. agreed to transition C.T. to Harold.

17. C.T.'s first day at Harold was February 1, 2016.

18. On that day, C.T. was scheduled for a shortened school day, from 8 to 11:30 a.m.

19. On February 1, 2016, B.T. dropped off C.T. at Harold at 8:00 a.m.

20. Between 8:00 and 11:00 District staff members restrained C.T. on two separate occasions for a total of one hour and thirty-eight minutes

21. At 11 a.m., B.T. took C.T. home.

22. On February 2, 2016, B.T. dropped off C.T. at 8 a.m. for his second day of school at Harold.

23. At or about 11 a.m., the District called B.T. to tell her that C.T. was being restrained.

24. The District asked B.T. to come pick up C.T. from Harold.

25. B.T. went directly to Harold to pick up C.T.

26. When B.T. arrived at Harold, Harold staff had C.T. restrained, with his arms behind has back, behind the Harold building.

27. At this time, the Harold principal said to B.T., "I'm not trying to be cold, but we're exhausted."

28. Through this comment, the Harold principal intended to indicate that Harold staff members were exasperated with C.T. and no longer desired to appropriately instruct him or provide the services to which he was entitled.

29. District staff restrained C.T. for 113 minutes during his second day of school at Harold.

30. Later that day, B.T. spoke to C.T.'s teacher, who stated that he wanted to use more sensory inputs with C.T.

31. On February 3, 2016, B.T. dropped off C.T. at 8 a.m. for his third day of school at Harold.

32. C.T.'s behavior specialist consultant, Lori Mondock, accompanied C.T. to school on February 3, 2016.

33. Mondock came to observe C.T. in his new school placement and provide any assistance she could to C.T.'s special education teacher.

34. Mondock was invited into the classroom for this purpose by the special education teacher.

35. Mondock observed the events that occurred on February 3, 2016 involving C.T. and Harold staff members, including the special education teacher and principal.

36. Mondock first observed gross motor activities conducted with the special education class, including C.T. in the gym, during which sensory pressure was implemented.

37. Following gross motor activities, the class, including C.T. returned to the classroom.

38. C.T. was rewarded with a lollipop for completing the activities.

39. The class, including C.T., then returned to the gym.

40. The Harold principal and other District employees, including special education support staff, were present in the gym.

41. When the class got to the gym, C.T. finished the lollipop.

42. C.T. tried to give the lollipop stick to the special education teacher to throw away.

43. The teacher refused to throw away the stick for C.T., instead instructing C.T. to do so himself.

44. The teacher directed two District staff members to take C.T. to the trashcan for

this purpose.

45. C.T. kicked the trashcan.

46. When C.T. did so, the Harold principal turned to Mondock and said, "We are exhausted. We are not going to let our teachers get beat up."

47. C.T. reengaged and returned to the special education classroom where he completed an academic task.

48. After completing the task, C.T. was provided his fidget box.

49. After three prompts from the special education teacher, C.T. cleaned up after himself in preparation for his morning snack.

50. Based on his past experiences at the District, C.T. expected to receive a preferred reward for his compliance.

51. The special education teacher refused to give this to C.T., saying that C.T. did not clean up fast enough.

52. C.T. became fidgety, stood up, and began pushing an iPad from across a counter.

53. When C.T. touched the iPad, the special education teacher physically escorted C.T. from the classroom.

54. The Harold principal instructed Mondock to follow C.T. and the special education teacher to the calming room for the purpose of helping the special education teacher.

55. When Mondock went to the calming room, the special education teacher told her to leave.

56. Mondock waited outside the room, where she was able to observe what occurred inside the room.

57. Mondock observed the special education teacher physically force C.T. face down

onto a mat on the floor.

58. The special education teacher was leaning on C.T. shoulders and had C.T.'s wrists hyperextended.

59. A Harold gym teacher assisted the special education teacher in holding C.T. in the restraint.

60. The special education teacher and gym teacher placed C.T. in an illegal prone restraint and held him there.

61. Mondock heard C.T. crying and repeating certain phrases throughout this restraint, including "just one more minute and you will let go of your arms", "let me go", "one more minute and you can go to the bathroom", and "just one more minute and you can go to lunch."

62. C.T.'s communication echoes what he wants adults to say to him. As such, C.T. was trying to communicate that he was in pain and wanted to get up.

63. The Harold staff members present knew as much regarding C.T.'s communication but refused to end or alter the restraint.

64. During the restraint, the Harold nurse entered the room, got down on the floor next to C.T., and asked, "Are you breathing OK?"

65. At 9:20 a.m., the Harold principal called B.T. and instructed her to come to the school immediately.

66. B.T. arrived at Harold at 9:48 a.m.

67. When B.T. arrived, she heard C.T. screaming.

68. B.T. proceeded to the room where C.T. was being restrained.

69. Through the door, B.T. observed that C.T. was wearing no shirt or shoes.

70. B.T observed that C.T. was face down on a mat, in a prone position, with two Harold staff members sitting on his shoulders and his wrists hyperextended.

71. B.T. shouted, "Let him go right now!"

72. The special education teacher refused, saying, "No, he needs to stay in this position one more minute."

73. B.T. again asked that they release C.T.

74. At this point, the special education teacher and Harold staff members released C.T. from the prone restraint.

75. C.T. was restrained in the prone position, with Harold staff members on his shoulders and his wrists hyperextended, for at least 25 minutes.

76. C.T. got up from the restraint, and he was very sweaty, physically weak, short of breath, and red in the face.

77. B.T. then took C.T. home.

78. As the day progressed, numerous bruises appeared on C.T.'s wrists, feet, and elbows.

79. C.T. also appeared to develop a limp and complained of pain in his right ankle and foot.

80. B.T. and G.T. took C.T. to the Shaker Urgent Care in Greensburg, PA later that day at about 6 p.m.

81. After being examined by a doctor and having x-rays taken, C.T. was sent home.

82. The next day, the doctor called B.T. to request that she bring C.T. back in based on review of the x-rays.

83. The examination and x-rays revealed that C.T. had a fracture on his right foot of

the 5th metatarsal, a bone contusion on his left wrist, and soft tissue edema to the right, lateral malleolus.

84. On or about February 5, 2016, B.T. contacted C.T.'s pediatrician as he was also experiencing testicular pain.

85. C.T.'s pediatrician conducted an evaluation of C.T. on February 11, 2016.

86. Blood was found in C.T.'s urine during this evaluation at the pediatrician's office.

87. C.T. was referred to the Urology Department at Children's Hospital of Pittsburgh.

88. A urinalysis and ultrasound were performed on C.T.

89. Blood was found in C.T.'s urine.

90. The doctor concluded that C.T.'s testicular pain and the blood in his urine were the result of recent trauma to his back and kidneys.

91. The trauma that caused C.T.'s fractured foot, bone contusion, bloody urine, and testicle pain was the prone restraint performed on him at Harold on February 3, 2016.

92. As a further result of the trauma inflicted upon him by Harold employees on February 3, 2016, C.T. also suffered extreme emotional harm.

93. District employees restrained C.T. so that they would not have to address his behaviors by less restrictive, and less convenient, means.

94. District employees used more force than necessary when restraining C.T.

### Count I: Violation of Constitutional Rights, 42 U.S.C. § 1983
Against Defendant Hempfield Area School District

95. Plaintiffs incorporate and reallege by reference all foregoing paragraphs as if fully set forth herein.

96. Defendant violated C.T.'s rights under the Fourth Amendment to the United States Constitution by utilizing unjustified and unreasonable force against him.

97. Defendant violated C.T.'s rights under the Fourth Amendment to the United States Constitution by acting with deliberate indifference to the foreseeable risk of harm to him.

98. Defendant violated C.T.'s rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by depriving him of equal protection under the law on the basis of disability.

99. Defendant violated C.T.'s rights under the Due Process Clause to the Fourteenth Amendment to the United States Constitution by subjecting him to physical and emotional harm without cause or justification, failing to protect C.T.'s bodily integrity, and intentionally interfering with the parent-child relationship through the concealment of information regarding the physical and emotional trauma inflicted on C.T.

100. As a direct and proximate result of the violations alleged, C.T. suffered substantial damages.

**Count II: Discrimination in Violation of Americans with Disabilities Act,
42 U.S.C. § 12131 *et seq.***
Against Defendant Hempfield Area School District

101. Plaintiffs incorporate and reallege by reference all foregoing paragraphs as if fully set forth herein.

102. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

103. At all times relevant to this Complaint, C.T. was a qualified individual with a disability within the meaning of the ADA and entitled to an equal opportunity to benefit from the public education programs of the District.

104. The District, through the actions of its employees, excluded C.T. from

participation in the District's education programs, denied C.T. the benefits of those programs, and discriminated against C.T. by placing him in an abusive and illegal prone restraint on the basis of his disability.

105. The District acted with deliberate indifference to the continuing harm caused by its employees by failing to intervene and failing to provide an appropriate program of education for C.T.

106. As a result of the District's actions, C.T. suffered substantial damages.

### Count III: Violation of § 504 of the Rehabilitation Act of 1973
Against Defendant Hempfield School District

107. Plaintiffs incorporate and reallege by reference all foregoing paragraphs as if fully set forth herein.

108. Section 504 of the Rehabilitation Act of 1973 provides that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal Financial assistance." 34 C.F.R. § 104.4.

109. At all times relevant to this Complaint, C.T. was a qualified child with a disability and entitled to an education free from discrimination based upon disability.

110. The District, through the actions of its employees, excluded C.T. from participation in the District's education programs, denied C.T. the benefits of those programs, and discriminated against C.T. by placing him in an abusive and illegal prone restraint on the basis of his disability.

111. The District acted with deliberate indifference to the continuing harm caused by its employees by failing to intervene and failing to redirect methods of behavior modification utilized by District employees.

112. As a result of the District's actions, C.T. suffered substantial damages.

### Count IV: Assault & Battery
Against Defendant Employees

113. Plaintiffs incorporate and reallege by reference all foregoing paragraphs as if fully set forth herein.

114. Defendant Employees intentionally and knowingly caused bodily injury to C.T.

115. Defendant Employees intentionally and knowingly put C.T. in fear of imminent serious bodily injury.

116. As a result of Defendant Employees' actions, C.T. suffered substantial damages.

### Count V: Intentional Infliction of Emotional Distress
Against Defendant Employees

117. Plaintiffs incorporate and reallege by reference all foregoing paragraphs as if fully set forth herein.

118. Defendant Employees intentionally engaged in extreme and outrageous conduct against C.T.

119. Defendant Employees intentionally placed C.T. in a prone restrain despite knowing the risks associated with prone restraints and the high probability that harm would follow.

120. Defendant Employees' actions caused C.T. severe emotional distress.

121. As a result of Defendant Employees' actions, C.T. suffered substantial damages.

### Count VI: Punitive Damages
Against Defendant Employees

122. Plaintiffs incorporate and reallege by reference all foregoing paragraphs as if fully set forth herein.

123. The conduct of Defendant Employees as against C.T. was intentional, malicious,

outrageous, and so far outside the bounds of human decency as to entitle Plaintiffs to an award of punitive damages.

## Prayer for Relief

Plaintiff requests judgment against Defendants for the following:

124. a judgment declaring that Defendants violated Plaintiff's constitutional rights;

125. compensatory damages in an amount to be determined at trial;

126. punitive damages;

127. costs to bring this action, including attorneys' fees and expenses; and

128. all other relief as the court may deem just and proper.

Respectfully submitted,

*/s/Marcus B. Schneider*
Marcus B. Schneider, Esq.
PA I.D. No. 208421
Alexander T. Poorman, Esq.
PA I.D. No. 321098
STEELE SCHNEIDER
428 Forbes Avenue, Suite 700
Pittsburgh, PA 15219
(412) 235-7682
(412) 235-7693/facsimile
marcschneider@steeleschneider.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2017, the foregoing **COMPLAINT** was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic case filing system and constitutes service of this filing under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure.  Parties may access this filing through the Court's ECF system.

*/s/ Marcus B. Schneider, Esquire*
Marcus B. Schneider, Esquire